**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 11-109-DLB-CJS**

**BANCINSURE, INC.**                                                                              **PLAINTIFF**

**vs.**                          **MEMORANDUM OPINION AND ORDER**

**U.K. BANCORPORATION INC./UNITED**
**KENTUCKY BANK OF PENDLETON COUNTY, INC.**                      **DEFENDANT**

* * * * * * * * * * * *

Plaintiff BancInsure, Inc. ("BancInsure"), commenced this action against Defendant U.K. Bancorporation Inc./United Kentucky Bank of Pendleton County, Inc. ("UKB"), pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, seeking a declaratory judgment that a Financial Institution Bond and Extended Professional Liability Policy issued to UKB are rescinded effective October 13, 2010 and rendered void *ab initio*, thereby precluding coverage for losses sustained as a result of UKB's President/CEO's embezzlement of funds totaling over two million dollars. Thereafter, UKB filed several Counterclaims against BancInsure seeking a declaratory judgment that UKB is entitled to coverage under the applicable policies and further alleging several state law claims, including a violation of the Unfair Claims Settlement Practices Act (UCSPA), K.R.S. § 304.12-230, failure to timely pay a claim in violation of K.R.S. § 304.12-235, and common law bad faith. This Court's jurisdiction is based on diversity, and Kentucky substantive law applies.

1

This matter is currently before the Court on Defendant's Motion for Summary Judgment (Doc. # 12) and Plaintiff's Cross Motion for Summary Judgment (Doc. # 22) on the declaratory judgment counts only.  Both motions have been fully briefed, (Docs. # 21, 23, 24, 25), and the matter is now ripe for review.  For the reasons stated herein, Defendant's Motion for Summary Judgment (Doc. # 12) is hereby **GRANTED IN PART** and **DENIED IN PART**, and Plaintiff's Cross Motion for Summary Judgment (Doc. # 22) is hereby **DENIED**.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

UKB was established in 1992.  Since that time, BancInsure provided insurance coverage to UKB under a Financial Institution Bond (FIB) and Extended Professional Liability Policy (EPL).  UKB's former President and Chief Executive Officer (CEO), Ed McCandless, completed all applications for the policies prior to his death in 2008. Thereafter, the Board of Directors appointed Donna Wood as President and CEO of UKB and gave her the authority to manage the operations and affairs of the bank.  Unbeknownst to UKB, or the Board of Directors, Wood had been embezzling funds, totaling over two million dollars, from the bank since approximately 2003.

### A.   Wood's Embezzlement

Pursuant to Fed. R. Evid. 201, the Court will take judicial notice of the details contained in Wood's Plea Agreement with the United States in Covington Criminal Case No. 2:11-cr-54-DCR (Doc. # 8).  In her written plea agreement, Wood agreed to the following facts relevant to her criminal conduct.

2

Wood began working at UKB when it first opened in 1992. She was initially hired as the Vice President and Chief Operating Officer (COO). After McCandless' death, Wood became the interim President for approximately six months until the Board made her the President and CEO. At the time, Wood had twenty-seven years of experience in the banking industry. Upon review of the bank's records as they related to four accounts owned by the bank, UKB's outside auditing firm discovered that from approximately March 2003, and continuing through January 26, 2011, Wood transferred funds belonging to UKB to three accounts at the bank owned by Wood and/or Rick Wood, her husband, Thomas Wood and Brett Wood, her adult sons, in the amount of $2,244,506.08.

Each time Wood took money, she prepared a fraudulent General Ledger Debit Ticket and a Deposit Slip or General Ledger Credit Ticket to place the funds into one of the three accounts. An example of how she committed the fraud included the following: On January 26, 2011, Wood prepared a General Ledger Debit Ticket for $22,500, to account 1200450, Fifth Third account, and a corresponding deposit slip for the same amount to account 8000042, Rick Wood, Special Account. On the General Ledger Debit Ticket for description she wrote: "Int. sec 1-25 SWD4" which would appear to be interest received by the bank if the ticket was reviewed by someone. On January 27, 2011, Wood wrote a check to UKB for $22,500, deposited $3,500 into account 8023255, Tom Wood, and deposited $19,000 into account 8033366, Brett Wood. The General Ledger Debit Ticket recording caused the financial records of the bank to show the bank had an additional $22,500 in the bank account at Fifth Third Bank.

To cover the thefts from the auditors and bank examiners, Wood delayed preparing their reconciliation until the next month's bank statement was received. Wood took figures

3

from that statement and recorded them as outstanding on her reconciliation.  Wood used figures from the next bank statement so when the auditor or examiner reviewed that account, she could provide them with a document which appeared to agree to her figures. Wood then added the outstanding figures so the reconciliation showed the bank balance agreed to the balance in the bank's accounting records.

**B.    The Financial Institution Bond and Extended Professional Liability Policy Common Application**

In 2010, Wood notified the Board that the current FIB and EPL Policy were set to expire in October 2010.  While the specifics are unclear, the board members agreed that a general discussion took place in which the Board confirmed that UKB should continue to seek coverage from BancInsure.[1]  The Board then gave Wood the exclusive authority to complete any applications or other documents on behalf of UKB that were necessary to obtain a renewal of the FIB and EPL policies.

On August 20, 2010, Wood completed a renewal application for the FIB and EPL Policy.  Besides the interim anniversary applications completed on November 2, 2008 and October 6, 2009, this was the only such application that Wood ever completed and signed on behalf of UKB.  In response to Question 1 of the renewal application, which asked for the "Officer designated as agent of the applicant and of all Directors & Officers to receive any and all notices from the Insurer or its authorized representative," Wood stated that she was the designated agent in her capacity as President of UKB.  (Doc. # 22-5, at 1).  Wood

---

[1] The Board's chairman, Carol Houchen, also testified that the Board discussed how much it would cost to purchase more coverage and whether or not more coverage was necessary.  Another Board member, Ronnie Mann, testified that Wood told the Board how much the premium payment would cost.  However, many of the other Board members did not recall any of the specifics of the conversation regarding the FIB and EPL Policy renewal.

4

also represented that she did not know any information about any act, error, or omission

which might give rise to a claim by answering "No" to the following question:

> 35.    Does any Director or Officer of the applicant have knowledge of or know information about any act, error, omission which might give rise to a claim under Directors and Officers Liability Coverage, Professional Liability Coverage, Employment Practices Liability Coverage, Lender Liability Coverage, Fiduciary Liability Coverage, a Financial Institution Bond or a Kidnap and Ransom Policy?
> If yes, please attach full details.
> **It is agreed that if such knowledge or information exists, any resulting claims are excluded from coverage.[2]**

(Doc. # 22-5, at 3).  The renewal application was signed on behalf of UKB by Wood as

President and CEO.  Directly above Wood's signature, the following declaration appears:

> THE UNDERSIGNED DECLARES THAT THE STATEMENTS SET FORTH HEREIN ARE TRUE.   THE UNDERSIGNED AGREES THAT IF THE INFORMATION SUPPLIED ON THIS APPLICATION CHANGES BETWEEN THE DATE OF THIS APPLICATION AND THE EFFECTIVE DATE OF THE INSURANCE, HE/SHE (UNDERSIGNED) WILL IMMEDIATELY NOTIFY THE INSURANCE COMPANY OF SUCH CHANGES, AND THE COMPANY MAY WITHDRAW OR MODIFY ANY OUTSTANDING QUOTATIONS AND/OR AUTHORIZATION OR AGREEMENT TO BIND INSURANCE.

(*Id.* at 5).

Based on the renewal application, BancInsure wrote and issued to UKB the FIB No.

0011059 and EPL Policy No. 0010952 both effective from October 13, 2010 to October 13,

2013.

### C.    Financial Institution Bond

Pursuant to the Bond, BancInsure agreed to provide coverage to UKB for "[l]oss

resulting directly from dishonest or fraudulent acts committed by an Employee acting alone

---

[2] This same question was asked in the November 2, 2008 and October 6, 2009 interim anniversary applications completed by Wood to which she also answered "No."

or in collusion with others" and with the intent "to obtain improper financial benefit for the Employee or another person or entity."  (Doc. # 22-6, at 7).  BancInsure was required to provide UKB with ninety days notice before BancInsure could cancel or terminate the Bond.   The FIB also provided that "[a]ny intentional misrepresentation, omission, concealment or incorrect statement of a material fact, in the application or otherwise, shall be grounds for the rescission of this Bond."  (*Id.* at 18).

### D.  Extended Professional Liability Policy

Pursuant to the EPL, BancInsure agreed to provide coverage to an "insured person," except to the extent that UKB has indemnified them, for "loss that is a result of a claim for management practices wrongful act" first made during the policy period ... ."  (Doc. # 22-7, at 5).  A "management practices wrongful act" is defined as "any actual or alleged error, misstatement, misleading statement, act or omission, or neglect or breach of duty by a director or officer acting solely in his or her capacity as a director or officer.  (*Id.* at 8). "Insured person" is defined as "any person who was, now is or shall be a director, officer, trustee, appointed member of an advisory board or committee, volunteer, organizer or employee of the company." (*Id.*).  BancInsure also agreed to provide coverage to UKB for loss that is the result of a claim for a management practices wrongful act to the extent that UKB had indemnified any insured person.  Additionally, BancInsure was required to pay public relations expenses to UKB that it incurred as the result of a management practices wrongful act which occurred during the policy period.

The policy also provides that if an insured becomes aware of circumstances that may give rise to a claim and gives notice of the potential claim to BancInsure, then the

6

incident will be treated as a "claim" made during the policy period.

At the end of the Exclusions Section of the EPL, there is a note stating:

No fact pertaining to or knowledge possessed by an insured person shall be imputed to any other insured person to determine if coverage is available, and only facts pertaining to and knowledge possessed by any past present or future chief executive officer, chief financial officer, president or chairman of the company shall be imputed to the company to determine if coverage is available.

(*Id.* at 13). Moreover, one of the general conditions state:

It is agreed by the company and insured persons that the particulars and statements contained in the application and the attachments and materials submitted with the application (which shall be retained on file by the Insurer and shall be deemed attached hereto, as if physically attached hereto) are true and are the basis of this policy and are to be considered as incorporated in and constituting a part of this policy. It is further agreed by the company and the insured persons that such particulars and statements are material to the decision to issue this policy and that the policy is issued in reliance upon the truth of such particulars and statements.

(*Id.* at 16).

Once the policy had been in effect for more than sixty days, it could only be cancelled for one or more of the following reasons:

(1)     Nonpayment of premium;

(2)     Discovery of fraud or material misrepresentation made by the parent company or with their knowledge in obtaining the policy, continuing the policy, or in presenting a claim under the policy;

(3)     Discovery of willful or reckless acts or omissions on the part of the parent company which increase any hazard insured against;

(4)     The occurrence of a change in the risk which substantially increases any hazard insured against after insurance coverage has been issued or

7

renewed;

(5)     The insurer is unable to reinsure the risk covered by the policy; and

(6)     A determination by the commissioner that the continuation of the policy would place the insurer in violation of the Kentucky insurance code or regulations of the commissioner.

(*Id.* at 22).   Moreover, BancInsure had to provide written notice of cancellation at least seventy-five days before the effective date of cancellation.

### E.      Proof of Loss and Denial of Claim

On February 10, 2011, UKB's outside auditing firm, Crowe Horwath LLP ("Crowe"), informed UKB that it had discovered irregularities in the bank's general register.   Crowe determined that Wood had embezzled over two million dollars from the bank.   The next day, UKB submitted a Proof of Loss statement to BancInsure to provide notice of the loss under the Bond and notice of a potential claim under the EPL Policy.

On May 19, 2011, following its investigation, BancInsure provided written notice to UKB that it was rescinding the FIB and EPL Policy effective October 13, 2010 and wrote a check for $10,047.49 to UKB for the return of the full amount of the premium paid for the insurance coverage.   BancInsure stated that its decision to rescind the FIB and EPL Policy was based upon misrepresentations in the renewal application signed by Wood as President/CEO.      Specifically,   BancInsure  asserted  that  given  Wood's  admitted embezzlement,   her   answer   to   Question   35,   discussed   *supra*,   was   an   intentional misrepresentation of the facts known to Wood at the time she signed the renewal application on behalf of UKB.   Had BancInsure known the true facts, BancInsure would not have issued the policies to UKB.    Thereafter, on May 20, 2011, BancInsure filed the

8

instant action seeking a declaratory judgment confirming the rescission of the FIB and EPL Policy.   The cross motions for summary judgment were filed after a brief period of discovery.

## II.    ANALYSIS

### A.    Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is not a genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The fact that both parties filed summary judgment motions does not alter the standard by which this Court reviews these motions: "When reviewing cross-motions for summary judgment, the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party."  *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

"The moving party bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), it must produce evidence showing that a genuine issue remains, *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000).  If, after reviewing the record as a whole, a rational fact finder could not find for the nonmoving party, summary judgment should be granted.  *Ercegovich v. Goodyear Tire & Rubber Co.*,

9

154 F.3d 344, 349 (6th Cir. 1998).

**B.    Rescission**

BancInsure seeks a declaratory judgment that the FIB and EPL Policy issued to UKB are rescinded effective October 13, 2010 and rendered void *ab initio*, as a result of UKB's President and CEO Wood's false statement made in the common application. Under Kentucky law, misrepresentations, omissions and incorrect statements in an application for an insurance policy shall not bar recovery under the policy unless they are (1) fraudulent; or (2) material either to the acceptance of the risk, or to the hazard assumed by the insurer; or (3) the insurer in good faith would either not have issued the policy, or would not have issued it at the same premium rate, or would not have issued a policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made available to the insurer as required either by the application for the policy or otherwise.   K.R.S. § 304.14-110.   In the application, Wood represented that she did not possess any information about any act, error, or omission which might give rise to a claim under the FIB or EPL policy. Undeniably, this answer was false as Wood had been embezzling funds from UKB for several years.  Moreover, it is undisputed that BancInsure relied on the representations made in the application when determining to issue the FIB and EPL Policy.  However, UKB argues that, pursuant to Kentucky law and general principal and agency theories, Wood's misrepresentation in the application concerning her own embezzlement cannot be imputed to UKB so as to preclude recovery under the applicable policies.

As an initial matter, the Court recognizes that this case presents a unique factual scenario that has yet to be addressed by any Kentucky court.   Moreover, the few

10

jurisdictions that have addressed this particular issue have handed down opposite results. *Compare Pereira (In Re Estate of Payroll Express Corp.) v. Aetna Cas. & Sur. Co.*, 186 F.3d 196 (2d Cir. 1999) (insurance policies were void *ab initio* due to President and CEO's materially false answer on application), *and Gordon v. Continental Cas. Co.*, 181 A. 574 (Pa. 1935) (imputing to the corporation the failure of its officer to disclose his defalcations on a fidelity bond application because the officer was not acting adversely to the corporation in procuring the bond), *with Puget Sound Nat'l Bank v. St. Paul Fire & Marine Ins. Co.*, 645 P.2d 1122 (Wash. Ct. App. 1982) (adverse interest exception applied and agent's knowledge of his misdeeds could not be imputed to the insured, even though the insurance application was filled out by a defalcating employee), *and Maryland Cas. Co. v. Tulsa Indust. Loan & Investment Co.*, 83 F.2d 14 (10th Cir. 1936) (same).  After a thorough review of the law in this area and particular consideration of the public policies at issue, the Court finds that Wood's knowledge is not imputed to UKB, and, therefore, the FIB and EPL Policy are not rescinded and remain in effect as of today.

### 1.   Adverse interest exception

It is well settled that a corporation, such as UKB, can only act through its agents. *Caretenders, Inc. v. Commonwealth*, 821 S.W.2d 83, 86 (Ky. 1991).  The general rule of agency law states that a principal is charged with notice of facts that an agent knows or has reason to know.  *See Illinois Cent R. Co. v. Fontaine*, 289 S.W. 263, 267 (Ky. 1926); *Taulbee v. Hargis*, 191 S.W. 320, 326 (Ky. 1917); *see also* Restatement (Third) of Agency § 5.03 ("[N]otice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal ... .").  This

11

general rule is based upon the presumption that "the agent will do his duty toward his principal and impart to the latter any knowledge which the agent obtains affecting his principal's business ... ." *Illinois Cent R. Co.*, 289 S.W. at 267.  However, "when there is no foundation for such a presumption, the reason for the rule ceases and it will not be applied." *Id.*  Accordingly, there is a clearly established exception to the rule, commonly referred to as the "adverse interest" exception.  *Id.*

The adverse interest exception provides that knowledge of the agent is not imputed to the principal when it is clear that the agent would not communicate the fact in controversy to the principal.  *Id.* at 267-268.  For example, where the communication of a fact would "necessarily prevent the *consummation of a fraudulent scheme which the agent was engaged in perpetrating*," the agent's knowledge is not imputed to the principal.  *Id.* at 268 (emphasis in the original).  Based upon this reasoning, Kentucky's highest court has stated that the general rule of imputation does not apply "when the transaction relates to personal matters of the agent ... and where his interests are adverse to those of his principal ... ." *Id*; *see also* Restatement (Third) of Agency § 5.04 ("[N]otice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person.").

In the present case, and despite BancInsure's arguments to the contrary, Wood was acting adverse to UKB's interests when she lied on the renewal application.  Had she been honest in completing the applications, UKB would have been able to submit a timely claim under the FIB.  Thus, by lying on the application, UKB did not benefit in any way.  For

12

approximately eight years, Wood had been involved in large scale fraudulent scheme which culminated in an embezzlement of over 2.2 million dollars from UKB, a company that she had been with for almost twenty years.  It is clear that she would not communicate this fact to UKB because it would "necessarily prevent the consummation of [the] fraudulent scheme which [she] was engaged in perpetrating." *Illinois Cent R. Co.*, 289 S.W. at 268. If Wood answered Question 35 on the renewal application truthfully, her fraud would have been revealed, and she would not have been able to continue embezzling funds from UKB. Therefore, since Wood's interests in concealing her fraudulent activity was adverse to UKB's interests, her knowledge of her embezzlement will not be imputed to UKB. However, the Court's inquiry does not end here, as there are certain exceptions to the adverse interest exception that may apply.

### 2.    Exceptions to the adverse interest exception

Kentucky courts have recognized three exceptions to the adverse interest exception. The adverse interest exception is not applicable under any of the following situations: "(1) [w]here the interested officer is the sole representative of two corporations; (2) where the corporation benefits by the transaction; and (3) where the interested agent acts for the principal, instead of dealing with him, in which case the presumption of communication obtains." *Ohio Valley Banking & Trust Co. v. Citizens' Nat'l Bank*, 191 S.W. 433, 438 (Ky. 1917) (citations omitted); *see also FDIC v. Am. Sur. Co. of New York*, 39 F. Supp. 551, 556 (W.D. Ky. 1941); *Hooker v. New Amsterdam Cas. Co.*, 33 F. Supp. 672, 674 (W.D. Ky. 1940).  The first instance is commonly referred to as the "sole actor" doctrine.  *Am. Sur. Co. of New York*, 39 F. Supp at 556.  BancInsure contends that these three exceptions to

13

the adverse interest exception apply in the present case because (1) Wood was the sole and only UKB representative with authority related to the transaction, i.e. procuring insurance coverage from BancInsure; (2) Wood was acting in the interest of UKB when completing the renewal application and procuring the issuance of the FIB and EPL Policy; and (3) UKB benefitted from Wood's fraudulent transaction by acquiring the insurance coverage needed in order to continue operating.  The Court disagrees.

### i.    Wood was not acting as the sole actor of UKB

Kentucky law is unclear as to how it actually applies the sole actor doctrine.  The first time the doctrine was recognized, it was defined as "[w]here the interested officer is the sole representative of *two* corporations."  *Ohio Valley Banking & Trust Co.,* 191 S.W. at 438 (emphasis added).  Indeed, the only two times the doctrine has been applied to impute knowledge to a principal involved situations in which the agent represented both parties in the transaction.  *See Am. Sur. Co. of New York*, 39 F. Supp. at 556; *Hooker*, 33 F. Supp. at 674.  Another scenario in which the Kentucky Court of Appeals recognized the sole actor doctrine is when the officer "is the sole representative of the corporation *with which he deals*, there being no acting officer from whom he can withhold or to whom he can impart his knowledge ... ."  *Ohio Valley Banking & Trust Co.,* 191 S.W. at 438 (emphasis added).  However, neither of those situations exist here.  First, Wood was not the sole representative of both UKB and BancInsure in the transaction, and, secondly, she was not the sole representative of UKB and personally involved in a transaction with UKB.

In *FDIC v. Pendleton*, 29 F. Supp. 779, 782 (W.D. Ky. 1939), the court stated that the sole actor doctrine was a "misleading and loose term,"  explaining that the doctrine was

based on a presumption that by reason of the principal-agent relationship, "the principal is presumed to have been told everything the agent has done and presumed to have condoned all his actions and promises." *Pendleton*, 29 F. Supp. at 782. As such, this presumption cannot exist where the facts to be communicated would convict the agent of defrauding the principal. *Id.* at 782-83. "The truth is that where an agent, though ostensibly acting in the business of the principal, is really committing a fraud, for his own benefit, he is acting outside of the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it." *Id.* at 783 (quoting *Thomson-Houston Elec. Co. v. Capitol Elec. Co.*, 65 F. 341, 343 (6th Cir. 1894)). Since the sole actor doctrine rests entirely upon the principal-agent relationship, that relationship cannot continue once the agent begins to defraud the principal. *Id.*

In the instant case, it is clear that Wood was not acting as the sole actor of UKB in procuring the FIB and EPL Policy. UKB had a Board of Directors that met and voted on important matters of the bank. With regards to the renewal application, the Board determined to continue to seek coverage from BancInsure, as it always had done, and decided how much coverage to obtain. While the Board gave Wood the "sole" authority to fill out the application to obtain the coverage, they gave her the authority to do so honestly and truthfully. By providing an incorrect answer on the application, Wood was not acting as the sole representative of UKB because she was acting outside the scope of her authority. Therefore, Wood was not the sole actor of UKB. *See Maryland Cas. Co. v. Tulsa Indust. Loan & Investment Co.*, 83 F.2d 14, 17 (10th Cir. 1936) (secretary-treasurer who filled out and submitted application was not sole representative of the corporation who

15

had a board of directors that acted with respect to the bonds by determining to secure them). While BancInsure argues that UKB should have maintained better supervision over Wood's actions, BancInsure has identified no evidence to prove that Wood's conduct could have been discovered earlier. Under these facts, Wood was not acting as the sole actor of UKB.

### ii. UKB did not benefit from, and Wood did not act for UKB in the transaction

Furthermore, Wood was not acting for UKB when she lied on the renewal application, nor did UKB benefit from Wood's actions. Wood's interests in carrying out her own fraudulent activity were adverse to those of UKB. During her time as President and CEO (and formerly as Vice President and COO), Wood had been wearing two hats–one as an officer and agent of the bank and another as an embezzler. While Wood was generally acting for the bank in filling out the application, she was acting on her own behalf when she answered "No" to Question 35 on the renewal application. *See Illinois Cent. R. Co.*, 289 S.W. at 268 (quoting 2 C.J. 853) ("But if the agent steps aside from the principal's business, for however short a time, to do acts not connected with such business the relation of agency is for that time suspended, and the agent is not acting within the course of his employment."). This misrepresentation allowed her to continue embezzling funds from UKB.

BancInsure argues that UKB benefitted from Wood's actions in filling out the renewal application because, based on Wood's representations, BancInsure wrote the FIB and EPL Policy for UKB. However, in the same breath, BancInsure contends that because of Wood's misrepresentations in the common application, the Bond and EPL Policy should

16

be considered void and rescinded effective October 13, 2010.  If the Bond and EPL Policy are null and void, they certainly cannot benefit UKB.  In fact, the opposite is true.  Because of Wood's misrepresentations, BancInsure now seeks to rescind the Bond and EPL Policy and, if it were successful in doing so, UKB is left without coverage for Wood's fraudulent activity.  Moreover, Wood's misrepresentation allowed her fraud to go unnoticed for a longer period of time, resulting in an even greater loss to UKB.  Consequently, under these unique facts, the Court finds that none of the exceptions to the adverse interest exception apply in this matter.

### 3.    Public policy

The Court recognizes this is a difficult case with two legitimate, competing interests. First, a bank whose board of directors was led to believe that its President and CEO would truthfully complete the renewal application so it could retain coverage for the very misconduct that same President was committing.  That same bank had renewed its coverage several times before the ill-fated 2010 renewal application, and each time the applications were approved by BancInsure.  Second, an insurer who may reasonably rely upon its insured's applications for coverage.

Given the unique factual circumstances of this case, it would be unjust to allow BancInsure to rescind the FIB and EPL Policy based on Wood's misrepresentation in the renewal application.  The very purpose of a financial institution bond is to cover losses caused by an officer's or director's dishonest or fraudulent acts.  What protection would the bond provide if the insurer could rescind the bond based on the same fraudulent acts that it purports to cover?  Moreover, how would a bank seek to protect itself in this instance?

If only one director or officer is engaged in fraudulent activity that no one else in the company knows about, which is exactly the scenario here, the company could never be reassured that the bond would provide coverage once the fraudulent activity was discovered.

Furthermore, in the instant case, the FIB provides that: "No statement made by or on behalf of the Insured, whether contained in the application or otherwise, shall be deemed to be a warranty of anything except that it is true to the best of the knowledge and belief of the person making the statement." (Doc. # 22-6, at 18). Thus, had any other officer or director filled out the application, there would be no question that Wood's knowledge could not be imputed to UKB, and the FIB and EPL Policy would remain in effect. It would be unjust to rescind the policies now, simply because Wood happened to be the one who filled out the application.

### C.   Financial Institution Bond Coverage

Pursuant to the Bond, BancInsure agreed to provide coverage to UKB for "[l]oss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others" and with the intent "to obtain improper financial benefit for the Employee or another person or entity." (Doc. # 22-6, at 7). The FIB is a "discovery" bond and "applies to loss discovered by the Insured during the Bond Period." *Id.* at 26. "Discovery occurs when a director, trustee, officer, branch manager or risk manager of the Insured first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this Bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount

18

or details of loss may not then be known." *Id.* Pursuant to the Bond, UKB had sixty days after discovery to notify BancInsure of the loss. *Id.* at 27.

It is undisputed that Wood's embezzlement constituted a "dishonest or fraudulent act[] committed by an Employee" with the intent "to obtain improper financial benefit for the Employee or another person ..." under the terms of the Bond. Moreover, UKB did not discover Wood's embezzlement until February 10, 2011, clearly within the bond coverage period. In accordance with the terms of the agreement, UKB notified BancInsure of the claim under the FIB only one day after its discovery. In addition, BancInsure has not identified any applicable exclusions. Consequently, UKB is entitled to coverage for Wood's fraudulent actions pursuant to the FIB.

### D.     Extended Professional Liability Policy Coverage

Pursuant to the EPL, BancInsure agreed to provide coverage to an "insured person," except to the extent that UKB has indemnified them, for "loss that is a result of a claim for management practices wrongful act" first made during the policy period. (Doc. # 22-7). A "management practices wrongful act" is defined as any actual or alleged error, misstatement, misleading statement, act or omission, or neglect or breach of duty by a director or officer acting solely in his or her capacity as a director or officer. "Insured person" is defined as "any person who was, now is or shall be a director, officer, trustee, appointed member of an advisory board or committee, volunteer, organizer or employee of the company." (*Id.*). BancInsure also agreed to provide coverage to UKB for loss that is the result of a claim for a management practices wrongful act to the extent that UKB had indemnified any insured person. Additionally, BancInsure was required to pay public

relations expenses to UKB that it incurred as the result of a management practices wrongful act which occurred during the policy period.  The policy also provides that if an insured becomes aware of circumstances that may give rise to a claim and gives notice of the potential claim to BancInsure, then the incident will be treated as a "claim" made during the policy period.  Finally, the policy is subject to several exclusions.

On February 11, 2011, UKB gave BancInsure notice of Wood's embezzlement and that her actions may give rise to a potential claim(s) under the EPL Policy.  UKB now seeks a declaratory judgment that coverage is owed under the EPL Policy.  However, no actual claims have been made.  While the Court finds that UKB has properly given notice of any potential claims that may arise from Wood's embezzlement in accordance with the terms of the EPL Policy, the Court cannot, at this time, find that coverage exists for any and all potential claims that may be brought in the future.  Until a specific claim is made, the Court cannot adequately address the terms of the policy and the possible exclusions that may apply.  Accordingly, UKB's Motion for Summary Judgment is denied in this respect.

### E.   Breach of Contract

The FIB required BancInsure to provide UKB with ninety days notice before BancInsure could cancel or terminate the Bond.  (Doc. # 22-6, at 30).  Similarly, pursuant to the EPL Policy, BancInsure had to provide written notice of cancellation at least seventy-five days before the effective date of cancellation.  (Doc. # 22-7).  UKB asserts that BancInsure breached both the Bond and EPL Policy when it did not provide the required notice before cancelling the policies.  The Court disagrees.

BancInsure did not seek to cancel or terminate the Bond and EPL Policy; rather it sought to rescind the contracts pursuant to Kentucky law.  *See* K.R.S. § 304.14-110.  As

20

stated above, K.R.S. § 304.14-110 provides that misrepresentations, omissions and incorrect statements in an application for an insurance policy shall not bar recovery under the policy unless they are (1) fraudulent; or (2) material either to the acceptance of the risk, or to the hazard assumed by the insurer; or (3) the insurer in good faith would either not have issued the policy, or would not have issued it at the same premium rate, or would not have issued a policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made available to the insurer as required either by the application for the policy or otherwise.  Given the lack of clarity in Kentucky case law and the split in authority among other jurisdictions, BancInsure certainly had reason to believe that Wood's knowledge could be imputed to UKB, thereby rendering the application void and rescinded effective October 13, 2010.  Accordingly, since BancInsure did not seek to cancel the Bond or EPL Policy, it was not required to give notice pursuant to the provisions of the contracts, and, therefore, it did not breach the policy agreements when it failed to provide notice to UKB prior to its decision to rescind the policies.

### F.    Kentucky Bankers Association's Motion for Leave to File a Brief as *Amicus Curiae*

On September 27, 2011, Kentucky Bankers Association (KBA) filed a Motion for Leave to File a Brief as *Amicus Curiae* (Doc. # 27) in the present case.  Plaintiff BancInsure has filed a response in opposition to the motion (Doc. # 30).  In its response, BancInsure argues that the KBA's motion is neither timely or useful, and is clearly a self-serving attempt to advocate in a partisan manner for UKB.

21

Participation as an amicus is "a privilege within the sound discretion of the courts, depending upon a finding that the proffered information of amicus is timely, useful, or otherwise necessary to the administration of justice." *United States v. Michigan,* 940 F.2d 143, 165 (6th Cir. 1991) (internal citations and quotations omitted).  The role of an amicus is generally "to aid the Court in resolving doubtful issues of law rather than present a partisan view of the facts." *Dow Chemical Co. v. United States,* No. 00-CV-10331, 2002 WL 33012185, at *1 (E.D. Mich. May 24, 2002) (citation omitted).

In describing the role of an amicus curiae, the Sixth Circuit has stated:

Historically, "amicus curiae" was defined as one who interposes "in a judicial proceeding to assist the court by giving information, or otherwise, or who conduct[s] an investigation or other proceeding on request or appointment therefor by the court."  Its purpose was to provide *impartial* information on matters of law about which there was doubt, especially in matters of public interest.  The orthodox view of amicus curiae was, and is, that of an *impartial* friend of the court-*not an adversary party in interest in the litigation*.

*Michigan*, 940 F.2d at 164-65 (emphasis in original) (internal citations omitted).  The Third Circuit has stated it this way: "[P]ermitting persons to appear in court . . . as friends of the court . . . may be advisable where third parties can contribute to the court's understanding ... ."  *Harris v. Pernsley*, 820 F.2d 592, 603 (3d Cir. 1987).

While the Court recognizes that the KBA has raised a number of policy considerations in its brief, the Court finds that many of the same issues have been raised by UKB.  Consequently, the Court finds that the proposed amicus brief will not aid the Court in resolving the issues before it and, therefore, KBA's Motion for Leave to File a Brief as *Amicus Curiae* (Doc. # 27) will be denied.

22

### III.   CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows:

(1)     Defendant UKB's Motion for Summary Judgment (Doc. # 12) is hereby **GRANTED IN PART** and **DENIED IN PART**;

(2)     Plaintiff BancInsure's Cross Motion for Summary Judgment (Doc. # 22) is hereby **DENIED**;

(3)     the KBA's Motion for Leave to File a Brief as *Amicus Curiae* (Doc. # 27) is hereby **DENIED**; and

(4)     within **twenty (20) days** from the date of this Order, the parties shall file joint or individual status reports addressing how the parties intend to proceed with UKB's remaining counterclaims.   The report(s) shall also address the process by which the monies held in the Court Registry's Investment System shall be returned to Bancinsure.

This 16th day of November, 2011.



**Signed By:**

*David L. Bunning*   $\mathcal{DB}$

**United States District Judge**

G:\DATA\Opinions\Covington\2011\11-109 MOO Cross MSJs.wpd